A. J. Mandt v. Commissioner. A. J. Mandt and Ola Fae Mandt v. Commissioner.
Mandt v. Commissioner
Docket Nos. 45656, 45657.
United States Tax Court
T.C. Memo 1955-226; 1955 Tax Ct. Memo LEXIS 111; 14 T.C.M. (CCH) 909; T.C.M. (RIA) 55226; August 12, 1955
*111 1. Held: The individual return filed by A. J. Mandt for the year 1944 and the joint return filed by A. J. Mandt and Ola Fae Mandt for the year 1945 were not false or fraudulent returns with intent to evade tax. Held, further, the statute of limitations having run with respect to both such years, assessment and collection of any deficiencies therefor are barred. Section 275, Internal Revenue Code of 1939. 2. Correct amount of ordinary income realized by Mandt in each of the years 1946 through 1949 with respect to payments received by him on a promissory note executed in 1945 by Lowell Hunter, determined. Richard L. Shook, Esq., 1026 Sixteenth Street, N.W., Washington, D.C., for the petitioners. O. P. Stevens, Esq., for the respondent. VAN FOSSAN *112 Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of A. J. Mandt and an addition thereto for fraud for years and in amounts as follows: 50 Per Cent
Addition
Year
Deficiency
for Fraud
1944
$10,154.85
$5,077.43
1946
194.10
1947
84.80
1948
600.77
1949
804.00
Respondent also determined a deficiency in income tax of A. J. Mandt and Ola Fae Mandt with an addition thereto for fraud for the year 1945, as follows: 50 Per Cent
Addition
Year
Deficiency
for Fraud
1945
$1,793.04
$896.52
The parties have made mutual concessions, all of which concessions will be reflected in the Rule 50 recomputation consequent hereon. The issues remaining to *113 be resolved are: (1) Whether the taxable income of petitioner in Docket No. 45656 was understated for the year 1944, as determined by respondent, and, if so, (2) Whether any part of the resulting deficiency was due to fraud with intent to evade tax, (3) Whether the taxable net income of petitioners in Docket No. 45657 was understated for the year 1945, as determined by respondent, and, if so, (4) Whether any part of the resulting deficiency was due to fraud with intent to evade tax, (5) Whether amounts collected during each of the years 1946 through 1949 in payment of a certain note held by petitioner in Docket No. 45656 constituted ordinary income or are to be allocated between ordinary income and return of capital, (6) Whether petitioner in Docket No. 45656 is to be allowed a capital loss carryover from the year 1945 to the years 1946 through 1949. Findings of Fact The stipulation of facts filed by the parties, with exhibits attached, is adopted, and, by this reference, made a part hereof. The petitioner in Docket No. 45656 is A. J. Mandt, who now resides in Lexington, Kentucky, and who filed his individual income tax returns for the years involved herein with the *114 collector of internal revenue for the district of Kentucky. The returns for the years 1946 through 1949 included a profit and loss statement reflecting inventories and expenses incurred in connection with the operation of a retail package liquor store; otherwise such returns were prepared on a cash receipts and disbursements basis. The petitioners in Docket No. 45657 are A. J. Mandt and his wife, Ola Fae, who filed a joint return for the year 1945 with the collector of internal revenue for the district of Kentucky. Such return was prepared on a cash receipts and disbursements basis. For convenience, A. J. Mandt will hereinafter be referred to as petitioner. Petitioner's father, W. F. Mandt, Sr., who will sometimes hereinafter be referred to as Mandt, Sr., began working in coal mines in 1884 at the age of 13. In or about 1919, he and his family moved to eastern Kentucky where he became associated with various coal mining concerns. During the early 1920s, he was made the general manager of Dudley Coal Company (hereinafter called Dudley), which conducted a coal mining operation at Letcher, Letcher County, Kentucky. Mandt, Sr. remained in charge of mining operations on the Dudley property *115 until the fall of 1932. In 1918, when he was about 14 years old, petitioner began to work around the mines over which his father had charge. He continued to work under his father's supervision during summer vacations until 1924. In 1924, at the age of 19, petitioner obtained a second class certificate from the Commonwealth of Kentucky permitting him to perform the duties of a mine foreman for a coal mining concern which operated in Perry County, Kentucky. He received a base wage of $200 per month and lived in a room over the commissary near the mine. In 1926, petitioner returned to Dudley where he was employed as a foreman at the same base wage. During this period, he lived with his parents at the Dudley mine. In addition to the base wages as foreman, he received bonuses which were based on production. During unspecified periods in the 1920s, petitioner supplemented his income by selling automobiles. He profited as much from this business as he did from working in the coal mines. Some time during the 1920s, Mandt, Sr. acquired a number of shares of Dudley stock. Petitioner also purchased 25 shares of stock of Dudley at some time prior to January 29, 1929. In 1922, Mandt, Sr. purchased *116 75 shares of stock in Marian Coal Company (hereinafter called Marian). Marian operated coal mines on lands situated near the Dudley property. In April 1923, Marian declared a 100 per cent stock dividend. On the same date, Mandt, Sr. transferred 38 of the 75 shares so received to his daughter Virginia Mandt and the remaining 37 to his other daughter Marguerite Mandt. Thereafter no Marian stock was transferred of record within the Mandt family. During the 1920s, Mandt, Sr. and his wife acquired additional bonuses in both Dudley and Marian. The certificates evidencing much of the stock thus acquired were signed in blank by the vendor and the shares were never formally transferred on the books of the issuing corporation. From time to time during the 1920s and early 1930s, petitioner acquired an aggregate of 100 shares of Dudley stock and 75 shares of Marian stock from his father, and some 40 shares of Dudley stock from various other persons in the community. None of the shares so acquired were transferred of record. Petitioner paid the par value, or $100 per share, for all of the Dudley and Marian stock acquired by him. Effective March 1, 1927, Dudley conveyed its leasehold rights in *117 and to the property in which it conducted its mining operations to South Chicago Coal & Dock Companp (hereinafter called South Chicago). South Chicago, a financially responsible company, was obligated to pay Dudley a minimum royalty of $30,000 per year. By the fall of 1932, South Chicago had exercised its option to extend the lease for an additional five year period ending in 1937. Dudley paid dividends during the later 1920s and early 1930s, usually at the rate of $6 per share. During the early 1930s, Dudley stock was considered a sound investment because the coal lands could be operated very profitably. During January 1933, the Dudley stock, which had a par value of $100 per share, also had a fair market value of $100 per share. At the time that South Chicago was negotiating for a lease on the Dudley property, it also gave serious consideration to leasing the Marian property. In 1929 or 1930, Marian encountered a fault in the main producing portion of its mine. After cutting into the fault approximately 3,000 feet without running into a mineable seam of coal, Marian abandoned its mine. It was common knowledge in the area that Marian had struck the fault. That fact reduced the *118 value of its stock. The elder Mandt and his associates, with full knowledge of the fault, offered to purchase Marian stock at $75 per share. During 1941 petitioner organized the Jeanne Francis Coal Company, which concern acquired the old Marian lease, as well as a lease to adjoining coal lands. By connecting the two properties underground, the fault was avoided. During the early 1940s Jeanne Francis Coal Company removed substantial tonnage from the old Marian property. During January 1933 the Marian stock had a fair market value of $75 per share. In the late fall of 1932, petitioner and his first wife and the elder Mandt and his family moved from Letcher to Alphoretta, Floyd County, Kentucky, where the elder Mandt planned to organize a coal mining company which was to be owned and controlled by him and members of his family. The Mandt family was very closely knit and was dominated by Mandt, Sr. at all times. The elder Mandt had the reputation of being a very capable and successful coal mine operator. He kept complete personal control of his business operations. From November 1932, until the latter part of January 1933, the Mandts removed coal from the properties at Alphoretta. *119 On January 27, 1933, Stephens Elkhorn Fuel Corporation (hereinafter called Stephens Elkhorn) filed its Articles of Incorporation with the Secretary of State of the Commonwealth of Kentucky and took over the business at Alphoretta. Pursuant to Article 4 of the charter, the capital stock of Stephens Elkhorn was $20,000 and was divided into 200 shares valued at $100 each. The three incorporators subscribed for the stock as follows: W. F. Mandt, Sr., 100 shares; petitioner, 50 shares; and Virginia Mandt, 50 shares. Upon the organization of Stephens Elkhorn, petitioner acquired 40 shares of the capital stock thereof. Petitioner transferred to his father all of the stock of Dudley and Marian which he had previously acquired, worked for one year without current compensation, and paid in some cash. With respect to the item of current compensation, it was agreed between petitioner and his father that the services of each were worth approximately $5,000 per year. As to the cash paid in, such amount was raised through the sale of an automobile, by means of loans on insurance policies of the petitioner and his wife, and by borrowing from petitioner's brother John. Petitioner also borrowed *120 an additional $500 from John to be used to pay for the initial inventory for the commissary which was subsequently taken over by Stephens Elkhorn. Petitioner's 40 shares of Stephens Elkhorn's stock were issued to him quite some time after the incorporation of the company. During the spring of 1951, at petitioner's place of business at Lexington, Kentucky, the examining revenue agent inquired of petitioner as to the cost of the 40 shares of Stephens Elkhorn stock, and was informed that such stock had cost $100 per share. Petitioner did not at that time mention his having transferred any Dudley or Marian stock, nor did the agent inquire as to the fact. On June 1, 1943, petitioner borrowed $7,999.92 from Stephens Elkhorn. The obligation, which he secured by posting his 40 shares of Stephens Elkhorn stock as collateral, was represented by a promissory note of that date. On June 1, 1943, Stephens Elkhorn issued two checks payable to petitioner, one for $4,000 and the other for $3,999.92. On June 2, 1943, he endorsed the $4,000 check and loaned the proceds to Jeanne Francis Coal Company (hereinafter called Jeanne Francis) by depositing the check to its credit at the First National Bank *121 of Pikeville, Kentucky (hereinafter some times called Pikeville National). On June 5, 1943, he cashed the $3,999.92 check and placed the money in a safe deposit box at the Pikeville National, which was registered in the name of his brother. On June 10, 1943, petitioner took the $3,999.92 from the safe deposit box and loaned same to Jeanne Francis by depositing such amount to its credit at the Pikeville National. Some time between June 1, 1943, and June 18, 1943, petitioner executed a series of notes for $222.22 each, one of which was due each month over the following three years. He gave the notes to Stephens Elkhorn in substitution for the original note of $7,999.92. Subsequent to June 18, 1943, Stephens Elkhorn requested petitioner to return to it the original note dated June 1, 1943, for $7,999.92 which Stephens Elkhorn had mailed to petitioner on June 18, 1943. Before complying, he defaced the note by tearing off his signature. As of December 31, 1943, three of the 36 notes had been paid, leaving a balance of $7,333.26 due Stephens Elkhorn. As of December 31, 1943, Jeanne Francis owed the petitioner $7,333.26. During February, 1944, petitioner borrowed an additional $10,000 from *122 Stephens Elkhorn. Shortly thereafter he transferred his Stephens Elkhorn shares to L. B. Brashear and his wife. The Brashears gave petitioner $20,000 in notes and in addition, Stephens Elkhorn canceled his indebtedness of $17,333.26. Some time prior to March 15, 1945, petitioner conferred with Arthur Dixon in his office in the Letcher County Court House, Whitesburg, Kentucky, regarding the preparation and filing of his Federal income tax return for the taxable year 1944. Dixon has served as judge pro tem and as Judge of the County Court of Letcher County for an aggregate of eight years. He also has served as secretary to the county attorney, and, at the time of the hearing herein, was doing clerical work in the office of the sheriff of such county. To supplement his income, Dixon, in the early 1930s, began filling out income tax returns in his spare time. He had prepared petitioner's returns in previous years. Prior to his conference with Dixon, petitioner prepared a detailed memorandum with respect to his acquisition and disposition of the 40 shares of Stephens Elkhorn stock, which memorandum he took with him to Dixon. Petitioner went over all of the information with Dixon to some *123 extent, and left all of the data with Dixon for the latter's consideration and preparation of a return. A few days following the conference, petitioner returned to Dixon's office. Dixon told petitioner of having discussed the matter with a man, with whom he often discussed such matters, and that this party was, like he was of the opinion that the transaction involving the disposition of the Stephens Elkhorn stock need not be reported because no profit had been realized therefrom. Pursuant to Dixon's recommendation, petitioner filed a Form W-2 for the taxable year 1944 in which was reported his salary from Jeanne Francis. During August 1944, petitioner entered into a contract with Hugh French for the purchase of a farm located in Woodford County, Kentucky (hereinafter called Woodford County farm) for $43,000, of which $10,000 was to be paid in cash and the balance was to be represented by a mortgage note. By March 1, 1945, petitioner completed the cash payment and on or about that date received the deed. Between March 1, 1945, and July 31, 1945, petitioner paid French a total of $1,000 principal and $543.33 interest on the $33,000 mortgage note. No deduction was claimed with respect *124 to the interest on the return for the taxable year 1945. During July 1945, petitioner sold the Woodford County farm to Lowell Hunter. Hunter paid petitioner $10,000 cash, gave him an installment note for $8,000 (hereinafter called Hunter note), and assumed the remaining balance of $32,000 due French on the mortgage note. The Hunter note, which had an agreed fair market value of only $1,000 as of December 31, 1945, was paid by Hunter as follows: Year
Amount
1946
$2,000
1947
1,000
1948
1,000
1949
4,000
During 1945 petitioner paid $300 as attorney fees for searching the title to the Woodford County farm. On March 1, 1945, he purchased 14,000 tobacco sticks which were used on the farm. The sticks, which cost $350, went with the farm when he resold it to Hunter. Petitioner paid $200 in expenses in connection with operating the farm while he owned it. No deduction was claimed for the attorney fees, the tobacco sticks, or the farm expenses on the return for the taxable year 1945. Petitioner reported no gain from the sale until the taxable year 1949 during which year he received the final payment from Hunter. In filing his return for 1949, petitioner reported *125 a long-term capital gain of $6,525 with respect to the sale. The gain, which was computed on the basis of a gross sale price of $51,000 and a cost basis of $44,475, was explained as follows on the 1949 return: "Taxpayer entered into a contract for the sale of farm on 10/11/45 which was not finally consummated until 6/4/49 when final payment was made. Therefore taxpayer is reporting profit on transaction in taxable year 1949." In determining the deficiency asserted against petitioner for the taxable year 1949, respondent included $4,500 as ordinary income with respect to the Hunter note and eliminated the long-term capital gain of $3,262.50. The adjustments were explained as follows: "[Inclusion] "(c) It is held that you realized ordinary income in the year 1949 on the collection of $4,500 on a note of Lowell Hunter. This sum was included in the gross salesprice of the long-term capital gain reported by you on your return for 1949. The long-term capital gain on the sale of a farm to Lowell Hunter has been excluded from income in the year 1949. (See explanation (e) following). "[Elimination] "(e) It has been determined that the long-term capital gain reported on your *126 return for the year 1949 in the amount of $3,262.50 on the sale of a farm to Lowell Hunter represented a short-term capital gain in the year 1945, limited to $1,000 of the fair market value at time of the sale of a second mortgage note in the amount of $8,000. Taxable net income for the year 1945 has been adjusted accordingly." The net income adjustment for the taxable year 1945, referred to above, was made by including the Hunter note in the net worth of petitioner and Ola Fae Mandt as of December 31, 1945, at $1,000. In determining the deficiency asserted against petitioner for the taxable year 1948, respondent included $2,500 as ordinary taxable income with respect to the Hunter note, which adjustment was explained as follows: "* * * It is held that you realize ordinary taxable income in the year 1948 on the collection of $2,500 on a note of Lowell Hunter, none of which was reported by you for this year. This note for $8,000 was received as part of the consideration on sale of farm by you in 1945, and it has been determined to have had a fair market value at that time of $1,000." During 1943 petitioner purchased a house in Hazard, Kentucky, for $2,400. The house was sold *127 in August 1944 for $3,000 at which time its adjusted cost basis was reduced to $2,340 by reason of allowable depreciation. Petitioner's first wife, from whom he was divorced a month earlier, received the entire proceeds from the sale. Petitioner did not report any portion of the $660 long-term capital gain for the taxable year 1944. The Jeanne Francis debt of $7,333.26 became worthless in 1945. No deduction was claimed therefor on the return for such year. In addition to this short-term capital loss [1] in 1945 and in addition to the short-term capital loss sustained in such year on the sale of the Woodford County farm, petitioner realized long-term capital gains and losses in 1945, as follows: Gain or (Loss)
Adjusted
to Be Taken
Item
Property
Cost Basis
Sales Price
Gain or (Loss)
Into Account
1.
125 shares capital stock of Jeanne
Francis
$12,500.00
2.
50 shares capital stock of Commu-
nity Fuel Co.
5,000.00
3.
Garage building - Blackey, Ky.
746.70
$10,000 [2]
($9,571.70)
($4,785.85)
4.
Half interest Wyatt Mining Equip-
ment
1,325.00 [3]
$19,571.70
5.
Mine equipment
1,325.00
1,500
175.00
87.50
6.
G.M.C. truck
1,100.00
1,000
(100.00)
(50.00)
*128 The $87.50 taxable gain was not reported on the return for the taxable year 1945. No deduction was claimed *129 with respect to any portion of the allowable loss. In making his determination for the years 1944 and 1945, respondent determined cash on hand, total assets, total liabilities, and net worth as follows: Total
Liabilities
Cash
and De-
As of
on
Total
preciation
Net
Dec. 31
Hand
Assets
Reserve
Worth
1943
$2,500
$39,335.17
$13,441.59
$25,893.58
1944
2,500
68,056.27
2,386.65
65,669.62
1945
2,500
83,440.97
16,911.56
66,529.41 In computing petitioner's net worth as of December 31, 1943, respondent included as a liability petitioner's debt to Stephens Elkhorn. [4] He did not include, as a corresponding asset, the amount of the receivable owed petitioner by Jeanne Francis. Petitioner's 40 shares of Stephens Elkhorn stock were included in total assets as of December 31, 1943, at $4,000. The total assets and total liabilities as of December 31, 1944, included only those of petitioner, while those as of December 31, 1945, included his as well as Ola Fae's. Included among the total assets as of December 31, 1945, was an item in the amount of $4,702.50 representing household furniture. Of this amount, approximately $2,000 represented *130 new furniture purchased with funds which Ola Fae had derived from the sale of personal assets prior to her marriage to petitioner. Respondent determined petitioner's living expenses for the years 1944 and 1945, as follows: Maintenance
Income Tax
of
Paid
and Gifts to
Living
Year
(Refunded)
Children
Expenses
1944
$1,165.81
$ 750
$3,000.00
1945
(244.91)
1,200
4,408.03
After eliminating 50 per cent of the long-term capital gains which he determined were derived from the sale of a house in Hazard, Kentucky, and from the sale of the 40 shares of Stephens Elkhorn stock, respondent added the above tax payment, maintenance costs of children, and living expenses, and then by use of the net worth method determined unreported income for the year 1944, as follows: Reported
Unreported
Correct
Net Income
Net Income
Net Income
$4,914
$22,781.18
$27,695.18
Petitioner was first married on February 17, 1930. At that time, petitioner was working on a straight salary. During the first two years of their marriage their standard of living was moderate rather *131 than luxurious. They were unable to save much money. Three children were born of that marriage. On or about December 30, 1942, petitioner and his first wife were separated. Thereafter, the first wife's attorney, Rodney Haggard of Winchester, Kentucky, wrote petitioner relative to alimony and a property settlement. Petitioner mentioned his marital difficulties to John M. Yost, an official of Pikeville National, whereupon Yost recommended petitioner consult with the bank's attorney, O. T. Hinton, of Pikeville. On April 8, 1943, petitioner had a conference with Hinton at which he informed Hinton of the nature and scope of his wife's demands. It was Hinton's opinion that these demands were unreasonable. Being cognizant of the law of Kentucky allowing a wife, under the circumstances, to attach her husband's property, including any bank accounts, without giving bond, Hinton advised petitioner to take such steps as were possible to preclude the possibility of such action by his wife's attorney. During the conference, petitioner called the Pikeville National to inquire as to the amount of the balance in his personal checking account and immediately withdrew $750 cash therefrom. Shortly thereafter *132 petitioner rented a safe deposit box at the Pikeville National in the name of his brother, W. F. Mandt, Jr., to which box petitioner had access. On December 31, 1943, petitioner had an account with the Peoples Bank of Hazard, Kentucky with a balance of $824.68. Petitioner possessed negotiable government bonds with an approximate value of $5,000 until on or about September 3, 1943, when they were liquidated. Petitioner's first wife never attempted to learn what petitioner's assets were nor did she authorize her attorney to do so. At the time of their divorce, petitioner and his first wife were both represented by a law firm in Lexington, Kentucky. Prior to his death in October, 1943, petitioner's father had, from time to time, made gifts of money to petitioner, which gifts aggregated approximately $12,000. During part of 1943 and 1944, petitioner kept substantial cash in a safe at his office, as well as in one which he had at his home. In December 1950, petitioner and his accountant were questioned by the examining revenue agent in connection with the computation of respondent's net worth statements. At that time the agent asked as to what amount they considered as cash on hand *133 at December 31, 1943 and 1944, and was informed by them that such amount was approximately $2,500. From January 1, 1944, to about the middle of April 1945, petitioner resided at Letcher, Letcher County, Kentucky, near the Jeanne Francis mine. Letcher, a small mining community in the mountainous area of eastern Kentucky, is approximately 18 miles from Whitesburg, Kentucky, and approximately 32 miles from Hazard, Kentucky, the County Seat of Perry County. Except for Blackey, Kentucky, which had a population of about 450 at that time and was about 2 miles from Letcher, Whitesburg and Hazard were the only towns or cities of any substantial size within a radius of approximately 90 miles. During 1944-1945 Whitesburg and Hazard had populations of about 3,000 and 8,000, respectively. Each served as a trading center for its surrounding mining community. Except for moving picture theatres, restaurants, and a roadside establishment near Hazard which offered metals, soft drinks, and music furnished by a nickelodeon, there were no places of amusement or entertainment readily available. From January 1, 1944, to about the middle of April 1945, petitioner put in from 10 to 12 hours per day in *134 and around the Jeanne Francis mine. Prior to his second marriage of February 8, 1945, petitioner lived alone. On the days which he spent at or around the mine, he followed the practice of eating breakfast, which he prepared himself, and an evening meal which he purchased for about $1.25. Due to gasoline rationing, his traveling was principally in connection with Jeanne Francis' business. After his divorce in July 1944, and prior to his second marriage, petitioner and his future wife had dinner together on many occasions at one of the restaurants in Hazard. The meals cost him about $1.25 per person. Occasionally during that period he and she patronized the roadside establishment referred to above, which was the only place in the Hazard-Whitesburg area offering music. On one occasion petitioner, his future wife, and friends spent a week end in Cincinnati, Ohio, and on another, they and relatives spent a week end in Frankfort, Kentucky. From time to time, petitioner entertained his friends and neighbors at his home. Respondent determined that petitioner realized a long-term capital loss of $7,371.70 during the taxable year 1945 from the sale of the G.M.C. truck, the mine equipment, *135 the Blackey garage building, the 125 shares of Jeanne Francis stock, and the 50 shares of Community Fuel Co. stock, and a shortterm capital gain of $1,000 from the sale of the Woodford County farm. Respondent increased the alleged increase in net worth for 1945 ($859.79) by (a), 50 per cent of the $7,371.70 long-term capital loss, (b), maintenance costs for the children, and (c), living expenses, and subtracted the income tax refund. He then determined unreported income for the taxable year 1945 under the net worth method, as follows: Reported
Unreported
Correct
Net Income
Net Income
Net Income
$2,551.55
$7,357.21
$9,908.76
After their marriage on February 8, 1945, petitioner and Ola Fae lived at Letcher until April 12, 1945, when they moved to Lexington where they owned their own home. The house was a brick colonial residence costing $14,500, of which about $9,161.56 was raised by a mortgage thereon. Petitioner's eldest child came to live with them in May 1945. On June 26, 1947, petitioner purchased premises known as 234-236 East Shore Street, Lexington, Kentucky, for $35,000, of which $15,000 was attributable to the land and $20,000 to the building. *136 The building, which he used in connection with his business beginning July 1, 1947, had a useful life of 40 years from and after July 1, 1947. Petitioner claimed no deduction for depreciation with respect to such building on his Federal income tax return for the taxable year 1947, nor was any amount allowed with respect thereto in determining the deficiency for that year. Although petitioner did not receive any regular salary for his services for the first year after Stephens Elkhorn was formed, he and his family did receive all their living expenses, including, among other things, living quarters, food, and doctor's expenses, from Stephens Elkhorn or its operator, Mandt, Sr. The tax returns filed by petitioner in 1944 and by petitioner and Ola Fae in 1945 were not false or fraudulent with intent to evade tax. Opinion VAN FOSSAN, Judge: Assessment and collection of any deficiencies for the years 1944 and 1945 are barred by the statute of limitations, see section 275, Internal Revenue Code of 1939, unless prior to the running of such statute, valid waivers thereof were executed or unless the returns filed by petitioner for the year 1944, and by petitioner and Ola Fae for the *137 year 1945, were false or fraudulent with intent to evade tax. See section 276, Internal Revenue Code of 1939. It appears that no waivers were executed. Thus, we consider first the question of fraud. Fraud connotes bad faith, a deliberate and calculated intention at the time the returns in question were prepared and filed to defraud the Government of taxes legally due. E. S. Iley, 19 T.C. 631. The existence of such an intent is never to be presumed. Nor is a mere suspicion or doubt as to the intentions of a taxpayer sufficient to justify the imposition of the so-called fraud penalty. L. Glenn Switzer, 20 T.C. 759. The presence of fraud must be proven by clear and convincing evidence, and the burden of producing such proof is, by statute, placed upon the respondent. See section 1112, Internal Revenue Code of 1939. Involving as it does the personal intent of the taxpayer, and intent being a state of mind, seldom can one isolated act or omission be singled out as evidencing *138 a fraudulent intent. Such intent is to be found by viewing a taxpayer's entire course of conduct. Thus, the existence, or absence, of a fraudulent intention on the part of the taxpayer at any particular time is a fact, and like any other fact, is to be deduced from all the evidence of record and any inferences properly to be drawn therefrom. Charles E. Mitchell, 32 B.T.A. 1093, affd. sub nom. Helvering v. Mitchell, 303 U.S. 391. If, after studying the record with the care a case of this nature requires, and with due consideration for the inferences, there remains a conviction, based on clear and convincing evidence, that any part of the deficiency was due to fraud with an intent to evade tax, only then may imposition of the so-called fraud penalty provided in section 293(b) of the Code of 1939 [5] be sustained. *139 In the instant case, respondent argues that the record is replete with evidence from which inferences of fraud may be drawn. Specifically, respondent decries petitioner's failure to keep satisfactory records or memoranda concerning his financial transactions in 1944 and 1945, which transactions involved the sale of certain capital assets. Respondent points out that petitioner was an experienced businessman, and maintains that such omission, when contrasted with petitioner's practice of maintaining a complete set of double entry books in 1946 and thereafter, presents a factor from which may be drawn an inference of his fraudulent intention to evade taxes in 1944 and 1945. We disagree. It would appear that petitioner began his practice of keeping a complete set of records at the time he became the owner of a liquor dispensary in Lexington. This apparently occurred sometime in 1946. Prior to that time, it seems, petitioner was a salaried employee, all of whose income, except that derived from the sale of the assets here in question, consisted of such salary. While it be true that all taxpayers, *140 except farmers and those whose income is derived solely from salary, wages, or similar compensation for personal services rendered, are required to keep such permanent books and records as will enable respondent correctly to determine the amount of income subject to tax, see also Regulations 111, section 29.54-1, the failure to comply with such requirement followed by the installation of the proper procedures, in our opinion, does not, without more, clearly and convincingly evidence a fraudulent design to evade taxes during the prior period. This is true in the present case regardless of whether or not we consider petitioner to have been an experienced businessman. Substantially all of the deficiency, as determined by respondent for the year 1944, springs from the transaction involving petitioner's sale in that year of his Stephens Elkhorn stock. In this connection, the specific question is in regard to the proper basis to be ascribed to such stock in petitioner's hands for determining gain. We have found facts on this record tending to support a higher basis therefor than that determined by respondent. Such finding is for the most part based upon the sworn testimony of petitioner. *141 After viewing and hearing petitioner when such testimony was given, and after considering all the evidence bearing upon the point and the attendant circumstances, including petitioner's admission against interest regarding the amount paid therefor, we see no reason to discredit such testimony. But, even if we were to do so, his mere failure to report income, standing alone, is insufficient to establish fraud. James Nicholson, 32 B.T.A. 977; L. Glenn Switzer, supra.Petitioner sought what he believed to be competent advice in the preparation of his return for 1944. Further, the party consulted was apprised of sufficient data appertaining thereto to make possible his becoming cognizant of the entire transaction. That the advice given by this party and acted upon by petitioner was erroneous, is obvious. Of course, petitioner's act of seeking consultation does not relieve him of his duty to render an accurate and honest accounting of his income. But, all of the facts considered, we feel that petitioner's failure to file a proper return and to report thereon the transactions in dispute does not evidence a calculated attempt to evade taxes. The most that can *142 be said is that petitioner was seriously negligent in determining the proper basis at which he held the stock in question. William W. Kellett, 5 T.C. 608, 618. The stipulation on file herein shows that petitioner also derived a gain in 1944 from a sale of a house in Hazard, Kentucky, in the approximate amount of $660. The evidence shows, and petitioner admits, that such gain was not reported. No other facts attending this transaction are shown. As pointed out above, such evidence falls short of establishing fraud. Regarding the year 1945, the record made is completely devoid of proof of the degree and character necessary to establish fraud. In fact, on most of the transactions involving the sale by petitioner in that year of the assets in controversy, petitioner sustained a loss, which losses were not claimed as deductions. In the few transactions from which gain was realized, such gain was wholly derived from, and equal to, the amount of depreciation allowed or allowable. Finally, no additional sources of income other than as reported by petitioner and Ola Fae in their 1945 return are shown. Thus we conclude that the tax returns filed by petitioner in 1944, and *143 by petitioner and Ola Fae in 1945, were not false or fraudulent with intent to evade tax. We have, accordingly, so found as a fact, and here so hold. It follows, therefore, that the assessment and collection of an income tax deficiency in either year, if any there be, are barred by the statute of limitations. The next question involves the proper tax treatment to be accorded the amounts collected by petitioner during each of the years 1946 through 1949 in payment of the Hunter note above referred to. The parties now agree that the note in question had a fair market value of $1,000 as at the end of the year 1945, during which year it was received by petitioner as part consideration for the sale by him of the Woodford County farm. Also, they further agree that, this being true, petitioner sustained a short term capital loss in 1945 of $650 on such transaction. They disagree as to the tax consequences of petitioner's subsequent collection of the full $8,000 face amount of the note. In this regard, both parties realize that of the amount so collected, $1,000, the fair market value of the note when received, constitutes a nontaxable return of capital. Victor B. Gilbert, 6 T.C. 10; *144 A. B. Culbertson, 14 T.C. 1421. Respondent, however, argues that the remaining payments, aggregating $7,000, constitute ordinary income in the years in which respectively received. Petitioner, on the other hand, contends that these amounts should be prorated in such years between ordinary income and return of capital since no tax benefit was derived from the $650 short term capital loss sustained upon the sale of the farm in 1945, citing Dobson v. Commissioner, 320 U.S. 489; Birmingham Terminal Co., 17 T.C. 1011, and cases cited therein. We disagree with the premise upon which petitioner's argument is based. That is to say, during 1945 petitioner sustained net capital losses in the aggregate of $17,479.96, of which $1,000 was properly allowable pursuant to section 117(d)(2) of the 1939 Code. [6] No authority exists, so far as we have been able to ascertain, for breaking down the total capital losses sustained in one year into component transactions, or for applying thereto a procedure such as the first in first out rule to determine which loss or losses are represented in the $1,000 deduction so determined. To the contrary, some portion of *145 every capital loss so sustained, minute though it may be, is properly allocable thereto. Thus, we sustain respondent's position and hold that the payments in controversy are taxable as ordinary income in the years in which they were respectively received. Since, as pointed out above, petitioner's net capital losses in 1945 amounted to a total of $17,479.96, only $1,000 of which was properly allowable in that year, petitioner is entitled to a net capital loss carryover of the remainder pursuant to section 117(e) of the 1939 Code. [7]
*146 Decisions will be entered under Rule 50. Footnotes
1. Petitioner concedes that the debt constituted a nonbusiness debt within the purview of section 23(k)(4), Internal Revenue Code of 1939↩. 2. Items 1-4 were sold to F. S. McComas during February, 1945 for $10,000. Respondent determined that Items 1 and 2 (stocks) were sold for $10,000 and that Item 3 (garage building) was sold for $800. Respondent did not take the sale of Item 4 (interest in Wyatt mining equipment) into account. ↩
3. The petitioner acquired his half interest in the Wyatt mining equipment on August 31, 1944 for $1,500. He sold his interest therein during February, 1945. The other mine equipment (Item 5) was acquired in September, 1944 and sold to Hallon during October, 1945. Respondent allowed depreciation in the amount of $175 with respect to the other mine equipment (Item 5). The adjusted cost basis of $1,325 for the Wyatt equipment was computed by allowing $175 as depreciation. Since the Wyatt equipment was held by petitioner for a shorter period than the other equipment (Item 5), an allowance of $175 as depreciation for the Wyatt equipment seems ample.↩
4. The debt was included at the erroneous amount of $7,333.34.↩
5. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
6. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(d) Limitation on Capital Losses. - * * *
(2) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer of [or] $1,000, whichever is smaller. * * *↩
7. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(e) Capital Loss Carry-Over. - (1) Method of Computation. - If for any taxable year beginning after December 31, 1941, the taxpayer has a net capital loss, the amount thereof shall be a short-term capital loss in each of the five succeeding taxable years to the extent that such amount exceeds the total of any net capital gains of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year. For purposes of this paragraph a net capital gain shall be computed without regard to such net capital loss or to any net capital losses arising in any such intervening taxable years.↩